Mildred B. HUTCHINS, Plaintiff,

v.

The BETHEL METHODIST HOME,
Defendant.

No. 72 Civ. 5351.

United States District Court,
S. D. New York.

Jan. 31, 1974.

Wasserman, Chinitz, Geffner & Green, New York City, for plaintiff; Bernard A. Green, New York City, of counsel.

Richard Brill, Bedford, N. Y., for defendant.

OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

The above-named plaintiff, Mildred B. Hutchins (hereinafter "Mrs. Hutchins") sues defendant, The Bethel Methodist Home (hereinafter "Bethel") for breach of contract. The case was tried to the court.

On or about July 29, 1960 Mrs. Hutchins, a widow, entered into a contract with Bethel whereby Mrs. Hutchins, designated as a "founder," agreed to pay a total of $9,000, a so-called "founder's fee," prior to her admission into the "home," which was located in Ossining, New York. In return, Bethel agreed, among other things, as follows: (1) That Mrs. Hutchins was to have the privilege of occupying a living unit consisting of a single room with lavatory, without private bath, in the home, which was to be subsequently erected, on condition that Mrs. Hutchins paid to Bethel the charge for board and care referred to in the contract; (2) At the time of admission, Mrs. Hutchins must have reasonably good health; (3) Mrs. Hutchins further agreed to pay Bethel an annual charge, payable monthly, quarterly or annually in advance, in the sum based on the cost of board and care determined from time to time by the Board of Directors of the said Bethel which Bethel "agrees will not exceed the rate of $160 per month." (Par. 7 of contract, Pl. Ex. 1.)

The contract specifically provided that Mrs. Hutchins "shall receive all necessary medical services and use of the Home's infirmary." Mrs. Hutchins agreed to pay for medicines and hospitalization if necessary.

Bethel interposed an answer which in substance admitted only the execution of the agreement, a copy of which was annexed to the complaint as Exhibit A.

Subsequently, as a result of testimony submitted on behalf of Bethel at the trial, Bethel was permitted to amend its answer.

AMENDED ANSWER

In the amended answer defendant admits paragraphs 1, 2, 3 and 13 of the complaint.

Defendant alleges that it is without knowledge or information sufficient to form a belief as to the truth in paragraphs 5 and 6 of the complaint and "therefore denies the same."

Defendant denies each and every allegation contained in paragraphs 7, 8, 9, 10, 11, 12 and 14.

In short, however, defendant admits the following:

(1) Execution of the agreement;

(2) That plaintiff paid all charges properly due and owing under said agreement;

(3) That plaintiff duly performed all of the conditions on her part required thereunder.

The following affirmative defenses are alleged:

"SECOND DEFENSE

"2. Plaintiff's medical condition from April 1972 to November 1972, inclusive, required a degree of skilled nursing care that exceeded what defendant provided or was able to provide at any time in its facilities, either before or after February 7, 1972.

"3. Plaintiff's medical condition from April 8, 1972 to November 25, 1972, as determined by a competent physician, required skilled nursing services which defendant never provided at any time in its infirmary from 1959 to the present.

"THIRD DEFENSE

"4. The Bethel Methodist Home and the Bethel Nursing Home Compa-

ny, Inc. are separate and distinct corporations and are required to be so under the Public Health Law of the State of New York and codes, rules and regulations of the Department of Health of the State of New York.

### "FOURTH DEFENSE

"5. The rate for patients in the Bethel Nursing Home Company, Inc. is set by the Department of Health of the State of New York, and changed by it from time to time. At all times during 1972 said rate was $42.00 per day.

"6. The Department of Health of the State of New York required the Bethel Nursing Home Company, Inc. to charge the plaintiff at the full rate of $42.00 per day for her care during the entire period that she was in said Nursing Home."

During the trial, counsel for Bethel requested leave to permit the New York State Department of Health to file a brief amicus curiae. The court granted counsel's request. (133.)[1] After the close of testimony the court designated the deadline for submission by the parties of their post-trial papers (188–189) and by letter dated January 2, 1974 suggested the time for submission of the amicus curiae memorandum. On January 8, 1974, Donald MacHarg, General Counsel, New York State Department of Health, wrote as follows:

"Re: Mildred B. Hutchins v. The Bethel Methodist Home (72 Civil 5351)

" * * * We have again reviewed the issues in the above entitled case, with which we are familiar, and have concluded that the Department of Health will not request leave to file a brief amicus curiae. * * * Your Honor's willingness to afford this Department an opportunity to file a brief amicus if it is so desired is appreciated."

During trial, counsel for defendant, on direct examination, asked Emilio Argenziano, M.D. (hereinafter "Argenziano"):

"Q. Doctor, when Mildred Hutchins left Cedar Manor in April of 1972, did you make a medical judgment at that time where she should be placed on the third floor of the Bethel Methodist Home or in the new Bethel Nursing Home?" (156.)

Counsel for plaintiff objected and the court sustained the objection on the ground of relevancy. However, the court then took a proffer of proof. (156.) Counsel for defendant restated the question and Argenziano answered, "Yes." As part of the proffer on direct examination, Argenziano then testified that in April of 1972 he judged that Mrs. Hutchins was not a candidate for the Bethel infirmary "because of her physical and mental status." (157–158.) As part of the proffer, on cross-examination by plaintiff's counsel, Argenziano testified in greater detail about the facilities and services available at the Bethel infirmary. (158–162.) Defendant briefed the admissibility of the proffer, but plaintiff failed to reply. After considering the possible relevancy of the proffer, I have decided to admit the direct and cross-examinations of Argenziano under the proffer.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This court has jurisdiction over the parties and the subject matter of this action. (28 U.S.C.A. § 1332.)

2. Plaintiff is a citizen of the State of Ohio and a resident of Bay Village, Ohio. (2, 3.) She was born on May 19,

---

[1.] Unless otherwise indicated, numbers in parentheses refer to the stenographic minutes of the trial before this court on October 23 and 24, 1973.

1881. (12; PTO–2(c).) [2] Defendant is a corporation incorporated under the laws of the State of New York. (PTO–2(a).) In 1959 defendant, Bethel, constructed a new building as a residence for persons over the age of sixty-five (12; PTO–2(b).)

3. Mrs. Hutchins and Bethel entered into a contract on July 29, 1960. (Ex. 3.) The contract (Ex. 3), in pertinent part, reads:

"THE BETHEL METHODIST HOME
Ossining, New York

FOUNDERS RESIDENCE AGREEMENT

Agreement made this 29th day of July, 1960 between Mrs. Mildred B. Hutchins, of 26 Ward Street, Floral Park, L.I., N.Y., hereinafter referred to as the 'FOUNDER' and the Bethel Methodist Home * * * hereinafter referred to as the 'HOME.'

Witnesseth:

The FOUNDER desiring to provide a retirement home for herself and desiring to contribute to the cost of construction of a new home building in Ossining, N.Y. agrees to pay the Home a FOUNDER'S fee of a total amount of $9,000.00 * * *; and in consideration thereof and of the mutual covenants and conditions hereafter contained the parties further agree as follows:

1. The FOUNDER shall have the privilege of occupying a living unit consisting of a single room with lavatory * * * in the new home in Ossining, N.Y.

* * * * * *

3. The privilege of occupying such living unit shall continue on condition that there shall also be paid to the HOME the charge for board and care hereinafter referred to.

* * * * * *

5. One of the conditions for residence in the Home is that the FOUNDER must, at the time of admission, have reasonably good health and he agrees to submit to an examination by the HOME'S physician or any other physician acceptable to the HOME at the time of admission.

* * * * * *

7. The FOUNDER agrees to pay to the HOME an annual charge, payable monthly, quarterly or annually in advance, based on the cost of board and care determined from time to time by the Board of Directors of the Home, which the HOME agrees will not exceed the rate of $160.00 per month. * * *

* * * * * *

9. The FOUNDER shall receive all necessary medical services and use of the Home's infirmary. The Founder shall pay medicines and hospitalization if necessary.

* * * * * *

12. This Agreement may not be modified or cancelled orally. All binding agreements between the FOUNDER and the HOME must be in written form and attached to this agreement.

In witness whereof the FOUNDER has signed and the HOME has caused this agreement to be signed on its behalf, the date first above mentioned.

(Signed by Mildred B. Hutchins and by officers of the Bethel Methodist Home)

Date July 29, 1960."

Pursuant to the contract (Ex. 3) Mrs. Hutchins as a "Founder" paid $9,000 to

2. Prior to trial the parties stipulated certain facts which were incorporated in the court's Pre-Trial Order. The court refers to this as "PTO" and by paragraph number.

Bethel as her contribution to the cost of constructing the Bethel residence building. (8; PTO–2(c).) Mrs. Hutchins moved into Bethel during September 1960 and remained there most of the time until February 5, 1972. (Ex. J.) From 1969 until February 7, 1972 Bethel staffed its infirmary with a nurse twenty-four hours a day. (9–10, 170–171.)

4. The Bethel Nursing Home, Inc. (hereinafter "Nursing Home") is a corporation incorporated under the laws of the State of New York. (PTO–2(f).) Bethel and the Nursing Home have the same board of directors, executive director, business manager and attorney, and corporate officers except for assistant secretary and assistant treasurer. The letterheads and bills of the defendant and the Nursing Home were combined and designated "Bethel Homes." (PTO–2(f).) On February 7, 1972 construction of a new residence building for the Nursing Home was completed. (PTO–2(e).) The residence buildings of defendant and the Nursing Home are located in Ossining, New York and have the same street address. (Exs. 5, 6, 8, 9, 10, 14.) Bethel's annual report for the year ending May 31, 1971 stated that the Nursing Home "will be the Health Center for the Bethel Methodist Home and its residents." (PTO–2(e).) Bethel admitted that it intended that its residents, including plaintiff, would have use of the Nursing Home for the same cost that they had use of the Bethel home. (35, 37.)

5. In February 1972 Bethel commenced renovating its infirmary. (91.) On February 7, 1972 Bethel reduced the staff of its infirmary. (170–173.) From February 7, 1972 until November 25, 1972 only one nurse visited Bethel, and then only three or four times a week. (175.) Renovations were completed in May of 1972. (91, 97.)

6. On February 5, 1972 Mrs. Hutchins sustained a fractured hip on defendant's premises. (PTO–2(g).) Bethel immediately transferred Mrs. Hutchins to the Phelps Memorial Hospital. (PTO–2(g).) Thereafter, Mrs. Hutchins was transferred to the Cedar Manor Nursing Home, where she remained until April 8, 1972. (66–67.) On April 8, 1972 Mrs. Hutchins was transferred to the Bethel Nursing Home, where she remained until November 25, 1972. (PTO–2(g)(1).)

7. Argenziano was Bethel's "Medical Director" between 1969 and November 25, 1972. In addition, Argenziano was Bethel Nursing Home's "Medical Director" between February 7, 1972 and November 25, 1972. In 1972, he treated Mrs. Hutchins during her stay at Bethel, Phelps Memorial Hospital, Cedar Manor Nursing Home and the Bethel Nursing Home, respectively. (134–135.)

8. Cedar Manor Nursing Home discharged Mrs. Hutchins on April 8, 1972 (PTO–2(g).) Argenziano examined Mrs. Hutchins just prior to her discharge and found (a) that Mrs. Hutchins had to be helped in walking as she had not gained use of her "walker" (140; Ex. J); and (b) that a nurse would have to check Mrs. Hutchins' blood pressure, heart beat and respiration once a day. (152.) Since defendant's infirmary was no longer staffed by a nurse twenty-four hours a day, Argenziano unilaterally determined that defendant's infirmary was then inadequate to serve plaintiff's health needs. (157–161; Finding of Fact No. 5.) He therefore directed plaintiff to the Bethel Nursing Home, where she was then transferred. (161; PTO–2(g).)

9. Mrs. Hutchins' health condition improved between April 8, 1972 and November 25, 1972. (Ex. J.) By letter dated September 22, 1972, Argenziano purported to determine that defendant's infirmary no longer staffed by a nurse twenty-four hours a day, was still inadequate to serve plaintiff's health needs. (Exs. D, J.) Mrs. Hutchins remained in the Nursing Home from April 8, 1972 to November 25, 1972. (46.)

10. Bethel billed Mrs. Hutchins only $160 per month for the period April 8, 1972 to September 12, 1972 (when she was in the Bethel Nursing Home), which charges Mrs. Hutchins paid in full. (PTO–2(h).) In May of 1972 Bethel instructed Mrs. Hutchins to make her $160 monthly payments directly to the Nursing Home and Mrs. Hutchins complied with this instruction from May 1972 to November 25, 1972 (17–18; Exs. 5, 6; PTO–2(h), (n).) Between April 8, 1972 and September 12, 1972, however, defendant paid the Nursing Home the difference between plaintiff's monthly payments of $160 and the Nursing Home's rate of $42 a day. (39–40; PTO–2(m).) During August of 1972 Bethel sent a letter to Charles M. Hutchins (son of Mrs. Hutchins) (2–4; Ex. 14) which reads, in pertinent part, as follows:

"Several residents have been transferred from the former infirmary to the new Nursing Home where the cost of 24 hour nursing care is much higher. The residential home must reimburse the Nursing Home for the difference." (39; Ex. 14.)

11. Between August and September of 1972 defendant reconsidered its "financial position" in light of the substantial reimbursements it had made to the Nursing Home on account of plaintiff's charges as well as the charges of other Bethel residents who had been admitted to the Nursing Home. (39–40, 101.) Effective September 12, 1972 Bethel discontinued paying the Nursing Home the difference between $160 per month and $42 per day for plaintiff's care at the Nursing Home, and never again paid the Nursing Home such sums. (Exs. 7, 9, 12.) The Nursing Home then billed plaintiff $42 per day on a monthly basis for services for the period of September 13, 1972 to November 25, 1972. Plaintiff refused to pay the increase demanded. However, she continued to pay, and the Nursing Home continued to accept, $160 per month. (PTO–2(i), (n); Ex. 8.) I find that defendant discontinued the aforementioned reimbursement of the Nursing Home on plaintiff's account solely for its own economic reasons. (38, 39, 40; Exs. 7, 9, 12, 14.)

12. On September 28, 1972 and November 6, 1972 defendant, through its agents, demanded that plaintiff sign a contract with the Nursing Home providing for increased charges and that plaintiff pay the Nursing Home the difference between $160 per month paid by plaintiff and $42 per day charged by the Nursing Home. (Exs. 8, 9, 10.) On November 17, 1972 defendant, again through its agent, demanded that plaintiff pay the Nursing Home the difference between $160 per month being paid by plaintiff to the Nursing Home and $42 per day being charged by the Nursing Home. (Exs. 8, 11.) Defendant threatened that if plaintiff failed to comply with its demands by November 30, 1972, it would immediately discharge her. (Exs. 10, 11.) The aforesaid demands and threats caused Mrs. Hutchins to withdraw from the Nursing Home on November 25, 1972 (31, 46; PTO–2(*l*) since this demand for a substantial increase in payment was a clear-cut breach of the contract (Ex. 3.)

13. Charles M. Hutchins, one of Mrs. Hutchins' sons, reserved a semi-private room for Mrs. Hutchins beginning on November 18, 1972 at the Bradley Road Hospital (hereinafter "Bradley"), Bay Village, Ohio, at the rate of $19 per day, totaling $6,935 a year. This "home" was the most reasonable in cost which plaintiff could find. (2–4, 49, 52, 129.) Plaintiff moved into Bradley on November 26, 1972 and was residing there on the date of trial, i. e., October 23 and 24, 1973. (3, 46, 68.) At the date of trial Mrs. Hutchins was ninety-three years old. (See Finding of Fact No. 2.) She plans to remain at Bradley for the remainder of her life. (54–55; Ex. 18.) The mortality table submitted by plaintiff indicates that she has a 4.8 year life expectancy at age ninety-three. (Ex. 19.) The table is not determinative; varying conditions as to the health of plaintiff may well affect her longevity. Under the circumstances here present, I estimate plaintiff's life expectancy as of

October 23, 1973 to be no more than three years.

14. Plaintiff has sustained damages of $19,718.35, computed as follows:

| | | |
|---|---|---|
| Cost of staying at Bradley between November 18, 1972 and October 23, 1973, i. e., $19 per day for 340 days (See Finding of Fact No. 13) | $ 6,460.00 | |
| *Less*: Cost of staying at Bethel between November 18, 1972 and October 23, 1973, i. e., $160 per month for 11 months and 5 days (See Findings of Fact Nos. 3, 10) | $ 1,786.65 | |
| *Balance* for the period of November 18, 1972 to October 23, 1973 (computed by the court) | | $ 4,673.35 |
| Amount brought forward | | $ 4,673.35 |
| Cost of staying at Bradley for 3 years beginning October 23, 1973, i. e., $6,935 per year for 3 years (See Finding of Fact No. 13) | $20,805.00 | |
| *Less*: Cost of staying at Bethel for 3 years beginning October 23, 1973, i. e., $160 per month for 36 months (See Findings of Fact Nos. 3, 10, 13) | 5,760.00 | |
| *Balance* for the three-year period beginning October 23, 1973 (computed by the court) | | 15,045.00 |
| *Net* amount of damages sustained by plaintiff (computed by the court) | | $19,718.35 |

15. Plaintiff is entitled to interest at the rate of 6 per cent per annum on $4,673.35 from October 23, 1973 to the date of entry of judgment. (See Finding of Fact No. 14.)

## DISCUSSION

■ In a diversity case the federal court must follow the choice of law rules prevailing in the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ Whether defendant breached the contract, and what circumstances, if any, constitute justification for refusal to perform, is determined by the law of the place of performance or, in the alternative, by the law of the state having the most significant contact with the "matter in dispute." Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954). The contract (Ex. 3), by its terms, was to be performed in New York and all the significant contacts are with New York. Therefore, New York law determines whether defendant breached the contract (Ex. 3) and what circumstances, if any, constituted justification for refusal to perform.

Under this contract (Ex. 3):

(1) Plaintiff, as a so-called "founder," paid the sum of $9,000 to assist in the cost of construction of a new retirement home building in Ossining, New York;

(2) The founder was to have the privilege of occupying a living unit consisting of a single room with lavatory (¶ 1 of contract);

(3) One of the conditions for residence in the home was that the foun-

der must, at the time of admission, have reasonably good health (¶ 5 of contract);

(4) The founder agreed to pay to the home an annual charge, payable monthly, quarterly or annually in advance, based on the cost of board and care determined from time to time by the board of directors of the home, not to exceed the rate of $160 per month (¶ 7 of contract);

(5) "The FOUNDER shall receive all *necessary medical services and use of the Home's infirmary.* The Founder shall pay medicines and hospitalization if necessary." (¶ 9 of contract) (Emphasis added.)

(6) "This Agreement may not be modified or cancelled orally. All binding agreements between the FOUNDER and the HOME must be in written form and attached to this agreement." (¶ 12 of contract).

Whether defendant breached the contract (Ex. 3) depends upon what obligations defendant assumed under this contract.

The rules applicable to the interpretation of this contract are as follows:

■ (1) Great weight should be given to a practical construction of the contract by defendant. Hart v. Hellman Co., 17 A.D.2d 438, 444, 235 N.Y.S.2d 23 (1st Dept.1962); aff'd mem., 13 N.Y.2d 633, 240 N.Y.S.2d 612, 191 N.E.2d 96 (1963); Insurance Co. v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410 (1877). See, e. g., Rentways, Inc. v. O'Neill Milk & Cream Co., 308 N.Y. 342, 126 N.E.2d 271 (1955); A. Corbin, Contracts, part 3, § 558 at 526 (1952).

When a party gives a contract a practical construction which is patently adverse to said party's economic interests and then fails to deny or explain away such practical construction, this rule is especially applicable.

■ Defendant gave the contract (Ex. 3) a practical construction which proves that the twenty-four hour nursing care given by the Nursing Home was an obligation of Bethel under the contract (Ex. 3) for the monthly charge herein specified, as follows:

(a) From April 8, 1972 to September 12, 1972 Bethel reimbursed the Nursing Home for the difference between $160 per month paid by plaintiff to the Nursing Home and $42 per day sought to be charged by the Nursing Home against plaintiff (Finding of Fact No. 10);

(b) Defendant admitted that it intended that its residents would have the use of the Nursing Home for the same cost that they had the use of defendant's infirmary and home (Finding of Fact No. 4); and

(c) From 1969 to February 7, 1972 defendant staffed its infirmary with a nurse twenty-four hours a day. (Finding of Fact No. 3.)

Defendant would have the court believe that the phrase, "The Founder shall pay medicines and hospitalization if necessary," constitutes a valid escape clause on which it may rely.

However, the following rules of interpretation of this clause refute that contention:

■ (1) The contract must be interpreted as a whole. Empire Properties Corp. v. Mfr's. Trust Co., 288 N.Y. 242, 248, 43 N.E.2d 25 (1942); Atwater & Co. v. Panama R. R. Co., 246 N.Y. 519, 524, 159 N.E. 418 (1927);

■ (2) " * * * Where there is ambiguity in the terms of a contract prepared by one of the parties, 'it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against' such party. [Citing cases.]" Rentways, supra;

■ (3) The court should seek a sensible meaning of the words employed and adopt a construction which accords with common sense. Heller v. Pope, 250 N.Y. 132, 135, 164 N.E. 881 (1928); Atwater, supra;

■ (4) Although not necessarily determinative, it has been stated that contracts of this nature, entered into by

persons of declining years, should receive a liberal construction in favor of elderly people. Tuttle v. Burgett, 53 Ohio St. 498, 504, 42 N.E. 427 (1895), cited in Blose v. Blose, 118 Va. 16, 24–25, 86 S.E. 911 (1915);

(5) If there is an ambiguity in an exclusory clause, such ambiguity must be resolved in favor of the obligee. See Connors v. Mut. Benefit Health & Accident Ass'n, 49 Misc.2d 776, 779, 268 N.Y.S.2d 154 (Monroe County Ct.1966).

The only reason which defendant supplied for its discontinuance of the reimbursement policy above mentioned on September 13, 1972 was its own financial condition. (Finding of Fact No. 11.) This "reason" is clearly inadequate to relieve defendant from the provisions of the contract; there is no basis for engrafting it upon the terms of the contract. Defendant has failed to prove by a fair preponderance of the credible evidence that plaintiff required "hospitalization" in the period between September 13, 1972 and November 25, 1972. As a matter of fact, defendant *excluded* plaintiff from its infirmary between September 13, 1972 and November 25, 1972. Defendant had reduced the nursing service it had previously made available at its infirmary. (Findings of Fact Nos. 3, 5.) Between 1969 and February 7, 1972 defendant had staffed its infirmary with a nurse twenty-four hours a day. (Finding of Fact No. 3.) However, between February 7, 1972 and November 25, 1972 only one nurse visited the infirmary, and then only three or four times a week. (Finding of Fact No. 5.) Defendant voluntarily reduced the services available at its infirmary and thereby sought to compel plaintiff to pay $42 per day for services in the Bethel Nursing Home when it had obligated itself to charge not more than $160 monthly.

The second defense in the Amended Answer, paragraphs 2 and 3, is insufficient in law. Even if true, the fact that plaintiff's medical condition required a degree of skilled nursing care which exceeded what defendant *provided* or *was able to provide* at any time in its facilities, etc., is not a defense.

Likewise, the statement in paragraph 3 of the Amended Answer, that plaintiff's medical condition required skilled nursing services which defendant *never provided at any time* in its infirmary from 1959 to the present, is equally ineffective as a defense.

The third defense, that is paragraph 4 of the Amended Answer, that the Bethel Methodist Home and the Bethel Nursing Home Co., Inc. were separate and distinct corporations and required to be so under the Public Health Laws of the State of New York, is equally flimsy in support of a defense.

For the same reason, the fourth defense, paragraphs 5 and 6 of the Amended Answer, which states that the Department of Health of the State of New York required the rate of $42 per day, is also insufficient to constitute a defense. The contract gave defendant no such escape from liability.

The second, third and fourth defenses set forth in the Amended Answer must be dismissed as insufficient in law. The refusal of the State to file an amicus brief may well be some evidence of its opinion as to these frivolous defense assertions.

Defendant argues that State Hospital Code § 740.1 (July 31, 1969) [3]

---

3. State Hospital Code § 740.1 (July 31, 1969) reads:

"Section 740.1 Policies and responsibilities. The operator shall:

"(a) determine and establish written policies consistent with the stated purposes of the health related facility, the program of services provided, its physical structure and equipment, the number and qualifications of staff members and their job classifications and descriptions;

"(b) be personally responsible for the operation of the health related facility;

"(c) be responsible for providing or arranging services for residents as required in this Chapter;

"(d) employ or otherwise arrange for the services of such personnel as are required in this Chapter; and

"(e) be responsible for compliance with all provisions of this Chapter."

prohibited it from admitting or retaining as a resident one for whom defendant could not provide adequate medical care. (Defendant's Proposed Conclusion of Law No. 13.) This is utterly irrelevant to determining whether defendant breached its contractual duty to provide plaintiff with "all necessary medical services and use of the Home's infirmary." (Ex. 3.)

 The measure of damages for breach of contract is the amount necessary to put plaintiff in as good a position as he would have had if defendant had abided by the contract. Dillon v. Magner, 29 A.D.2d 759, 760, 287 N.Y.S. 2d 519 (2d Dept. 1968.) On January 29, 1973 plaintiff's sons purchased a single premium life annuity policy at the cost of $38,000. (54–55; Ex. 18.) Plaintiff contends that the cost of the policy is one element of her damages. (Plaintiff's Proposed Conclusion of Law No. 10.) The purpose of the annuity was to provide funds for the monthly payments over the remainder of plaintiff's life sufficient to satisfy her future obligations to Bradley. If the monthly payments total less than $38,000 at plaintiff's death, then the insurer is required to refund the difference to plaintiff's sons. (Ex. 18.) This annuity, consequently, is no evidence of plaintiff's future damages as of the date of this decision.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the persons and subject matter of this action.

2. New York law governs the rights of the parties to this action.

3. Plaintiff has proved by a fair preponderance of the credible evidence that defendant breached the contract (Ex. 3).

 4. Plaintiff is entitled, by reason of said breach of contract, to judgment in the amount of $19,718.35 together with costs and disbursements in this action and with interest as heretofore stated.

Settle judgment upon notice pursuant hereto.