**ALLEN–MYLAND, INC.**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION.**

Civ. A. No. 85–6166.

United States District Court,
E.D. Pennsylvania.

Aug. 1, 1991.

Robert G. Levy, and Frank, Bernstein, Conaway and Goldman, Baltimore, Md., for Allen–Myland, Inc.

Evan R. Chesler, Cravath, Swaine and Moore, New York City, for International Business Machines Corp.

## MEMORANDUM AND ORDER

O'NEILL, District Judge.

## I. INTRODUCTION

At the conclusion of my decision holding AMI liable with respect to certain of IBM's counterclaims, *Allen–Myland, Inc. v. International Business Machines Corp.*, 746 F.Supp. 520 (E.D.Pa.1990) ("*AMI v. IBM II*"), I directed the parties to brief any issues related to appropriate relief before I entered judgment in accordance with my decision. *Id.* at 559–60. Specifically, I directed the parties to attempt to agree on the amount of damages to be awarded on IBM's First, Third and Fourth Counterclaims. *Id.* at 560. I also requested the parties to submit proposed orders entering judgment on both AMI's claims and IBM's counterclaims and granting injunctive relief for IBM's Third, Fifth and Sixth Counterclaims to the extent IBM prevailed on those claims. *Id.* I said that I would appoint a special master if the parties could not agree on monetary and injunctive relief. *Id.* Presently before me are IBM's and AMI's proposals on these subjects.

I find that I can decide the following legal issues raised by the parties without reference to a special master: the date from which prejudgment interest should be

calculated for the First Counterclaim (Tuscon Electric); the necessity for damages for the First Counterclaim (Northwest Industries); the method by which damages should be calculated for the Third Counterclaim; and the request by AMI that I reconsider my ruling on the Fourth Counterclaim. I also find I can shape injunctive relief for the Fifth and Sixth Counterclaims in part without reference to a special master. I will refer the question of which tapes AMI should be required to destroy and all remaining issues related to damages to a special master to be appointed pursuant to Fed.R.Civ.P. Rule 53 for report and recommendation. Finally, I will reserve decision on further injunctive relief and whether the parties need brief the issues related to a stay of relief.

## II. DAMAGES DISCUSSION

### A. *IBM's Third Counterclaim: Infringement of IBM's 3090 Microcode Copyright.*

Section 504(b) of the Copyright Act provides:

> (b) Actual Damages and Profits. The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement; and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b) (1977 and 1990 Supp.).[1]

■ AMI contests both the need to invoke the statutorily prescribed process of calculating damages and the necessity of referring the calculation of damages to a special master. AMI's Memorandum Concerning Relief at 4–7. AMI argues that rather than follow the process outlined in the statute to arrive at damages owed I should cap IBM's potential recovery at $420 per tape copied for reconfiguration purposes. *Id.* at 5, 6. AMI bases its argument on my earlier finding that IBM would supply anyone with a copy of the 3090 microcode to support a reconfiguration for between $420 and $2100 depending on the number of 3090 microcode tapes that had to be changed. *Id.* at 4; *AMI v. IBM* II, 746 F.Supp. at 541. AMI reasons that "if customers could obtain the supporting microcode from IBM at $420 per tape, then they would have no reason to pay AMI any more than $420 per tape for its microcode. Thus the portion of AMI's revenue (and consequent profit) 'attributable to its infringement' is no more than the $420 per tape handling charge." AMI's Memorandum Concerning Relief at 5; *see also* AMI's Reply Memorandum Concerning Relief at 26.

I decline to adopt AMI's method of calculating damages. The statute providing for copyright infringement remedies gives "specific unambiguous directions concerning monetary awards," including the burdens to be met by the copyright owner and by the infringer. 17 U.S.C. 504(b); Notes of Committee on the Judiciary In General at 606.

AMI supplies no copyright law precedents for its proposed departure from the method of calculating damages mandated by the statute by equating the license fee with profit attributable to the infringement.[2] *See Kleier Advertising Co. v.*

---

1. Although IBM sued under the 1976 Copyright Act, both parties cite decisions construing the 1909 Copyright Act in support of their arguments. As courts rely on decisions construing the 1909 Act as at least persuasive authority in construing the later Act, I will also rely on these decisions where appropriate.

2. Rather than citing copyright precedent, AMI relies on my finding in *Allen–Myland, Inc. v. International Business Machines Corp.,* 693

F.Supp. 262, 290 (E.D.Pa.1988) ("*AMI v. IBM* I") that AMI had not established any demand for its 308X upgrade services because it could have offered such services only at a charge higher than IBM's charge. AMI Memorandum Concerning Relief at 5. This portion of my earlier antitrust decision is not relevant to a determination of the method to be used to calculate damages for copyright infringement.

*James Miller Chevrolet, Inc.*, 722 F.Supp. 1544, 1546 (N.D.Ill.1989) ("license fees represent saved acquisition costs and are distinct from the profits attributable to the infringement"). AMI's alternative proposal makes no reference to the step-by-step process the statute provides for determining damages[3] nor is the proposal consistent with the Congressional intent to deter infringement by awarding profits. *See* 17 U.S.C.A. 504, Historical Note, Notes of Committee on the Judiciary on Actual Damages and Profits at 606 ("profits are awarded to prevent the infringer from unfairly benefiting from a wrongful act"); *Kamar International, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir.1984) (award of infringer's profits is aimed in part at deterring infringements).

Indeed, as IBM points out, application of AMI's theory would create incentives opposite to those intended by the statute, since an infringer would keep any unjust enrichment and pay only what legitimate competitors had been paying all along: "That result would not only eliminate the statutory intent to discourage copying, it would provide an affirmative incentive to the legitimate competitor to cross the line." IBM's Reply Memorandum Concerning Relief at 7. I therefore will adhere to the process prescribed by Congress to calculate damages for copyright infringement. *See infra*, Section IV "Appointment of Special Master."

B. *IBM's Fourth Counterclaim: Breach of Contract for a 3090 400E/200E Split RPQ*

In its memorandum concerning relief, AMI moves for reconsideration of my earlier ruling on IBM's Fourth Counterclaim. *AMI v. IBM* II, 746 F.Supp. at 550–52. AMI argues that my holding that it would impermissibly "permit AMI to enforce the Decree" to allow "AMI to enter a contract which it believed violated the Consent Decree, breach the contract, and then defend against the breach of contract claim by claiming that the contract violated the Consent Decree," *id.* at 551–52, is inconsistent with the Supreme Court's holding in *Kaiser Steel Corporation v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). AMI Memorandum Concerning Relief at 14–15.

AMI's reliance on *Kaiser* is misplaced. In *Kaiser*, the Supreme Court permitted a defendant in a breach of contract case to raise the defense of illegality because the promise may have violated the antitrust or labor laws. *Kaiser*, 455 U.S. at 79, 102 S.Ct. at 857. Unlike the defendants in *Kaiser*, AMI has attempted to defend against enforcement of its voluntarily assumed contractual obligation because the contract allegedly violates the Consent Decree. But the alleged illegality in *Kaiser* concerned the antitrust or labor laws, not a violation of a consent decree to which the defendant was not a party. The *Kaiser* decision therefore is not relevant to my holding that the Consent Decree is not enforceable by a non-party and that to allow AMI to avoid its voluntarily assumed contractual obligations because the contract allegedly violates the Consent Decree in effect would permit AMI to enforce the Decree.[4] *AMI v. IBM* II, 746 F.Supp. at 551–52; *see also* IBM Reply Memorandum Concerning Relief at 36–37. I therefore will adhere to my earlier ruling on IBM's Fourth Counterclaim.[5]

---

**3.** AMI does refer to its proposed cap of $420 per tape as both "a fair basis of division" and as the portion of AMI's profit "attributable to the infringement." AMI Memorandum Concerning Relief at 5. This is semantics only. Although AMI uses the appropriate language, in arriving at the $420 cap it has not applied the concepts which by statute govern the calculation of damages.

**4.** In the context of a separate argument, AMI concedes that if the court permitted private enforcement of a consent decree it would create a

remedy not authorized by Congress. AMI Memorandum Concerning Relief at 7.

**5.** None of the other cases cited by AMI supports its argument that an alleged violation of a consent decree immunizes a contracting party from the enforcement of a voluntarily assumed obligation. Two decisions involve unsuccessful attempts to assert defenses to breaches of contract based on allegations that the contracts violated the antitrust laws. *See National Souvenir Center Inc. v. Historic Figures Inc.*, 728 F.2d 503, 516 (D.C.Cir.), *cert. denied sub nom. C.M. Uberman*

The parties agree that with respect to IBM's Fourth Counterclaim AMI owes IBM $365,223 in damages as of September 6, 1990, representing $324,000 in principal and $41,223 in prejudgment interest up to September 6, 1990. *See* Letter to Court from IBM, November 2, 1990 at 3; AMI Memo at 14. The parties should stipulate to the additional interest since September 6, 1990 and to the total amount AMI should pay IBM with respect to this counterclaim.

C. *IBM's Fifth and Sixth Counterclaims—Lanham Act and Unfair Competition for 3090 Microcode Labels and Screen Notices*

In my decision on liability, I held that IBM had established all of the elements of its Lanham Act and unfair competition claims regarding AMI's labels for 3090 microcode, *AMI v. IBM* II, 746 F.Supp. at 553, and I directed the parties to submit proposed forms of injunctive relief for the Fifth and Sixth Counterclaims to the extent IBM prevailed on those claims. *Id.* at 560. The parties do not dispute that in molding relief for these counterclaims I should be guided by principles of equity. AMI Reply Memorandum Concerning Relief at 48 and n. 26; cases cited at IBM Memorandum Concerning Relief at 42; *see also* 15 U.S.C. § 1116 (1990 Supp.).

IBM proposes that AMI be enjoined from "engaging in the same violations in the future," IBM Memorandum Concerning Relief at 41, and both IBM and AMI have proposed specific labelling practices as prospective relief. IBM Proposed Order at ¶ 20; AMI Proposed Order at ¶ 20. On the current record, I can shape an appropriate remedy for AMI's past violation of IBM's rights in its labels but I will reserve decision as to what relief should be imposed prospectively.[6]

IBM has proposed as a remedy for AMI's past violations that AMI be required:

to identify the customers who received falsely labelled 3090 microcode, identify the systems for which that code was supplied, notify the affected customers of the Court's decision and of the Court's Order and Judgment, recall any remaining falsely identified copies distributed by AMI, and turn them over to IBM.

IBM Memorandum Concerning Relief at 41–42.

AMI contests the necessity of any retrospective relief at all "because there is neither adverse effect on IBM nor confusion to the public to be remedied." AMI Reply Memorandum Concerning Relief at 45 and n. 25; *see also* AMI Memorandum Concerning Relief at 16–17. To the extent that AMI is attempting to relitigate its liability for the Fifth and Sixth Counterclaims, I decline to reconsider my earlier decision on liability. *AMI v. IBM* II, 746 F.Supp. at 553.

AMI resists IBM's proposal that it identify the end users who received 3090 microcode with the false labels because "virtually all" of AMI's customers were leasing companies, not end users, and it was the leasing companies which dealt directly with the end users. AMI Memorandum Concerning Relief at 16; AMI Reply Memorandum Concerning Relief at 46. As IBM

---

*Enterprises, Inc. v. Historic Figures, Inc.,* 469 U.S. 825, 105 S.Ct. 103, 83 L.Ed.2d 48 (1984) ("[t]he remote danger ... that the court will be a party to enforcing an illegal restraint, seems far outweighed by the probability that allowing the defense would let the buyer escape from its side of a bargain long after it had secured exactly what it had bargained for") and *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1060 (5th Cir.), *reh. den.,* 683 F.2d 1373 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) (antitrust defense inapplicable because enforcement of contract would not assist party to commit conduct forbidden by antitrust laws). *See also Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959).

6. The prospective injunctive relief regarding the labelling of copies AMI makes in the future is related to what and under what circumstances AMI will be permitted to copy in the future. For example, IBM objects to AMI's proposed plan for future labelling: "[AMI] would tie its only prospective requirement to the broad permissive copying regime embodied in paragraph 18 of AMI's proposed Order." IBM Memorandum Concerning Relief at 43. Accordingly, I will withhold decision with respect to what label AMI will be required to affix in the future pending my decision of appropriate relief for the Third Counterclaim. *See* infra at 36–37.

correctly points out, "either [AMI] or its leasing company customers know the end users to which AMI provided its unlawfully labeled microcode," IBM Reply Memorandum at 50, and therefore AMI is able to produce this information to IBM without undue hardship. Further, unlike the decisions on which AMI relies, identification of the end-users would not be "difficult, if not impossible." *Orion Pictures Co. v. Dell Pub. Co.*, 471 F.Supp. 392, 397, 394 (S.D.N.Y.1979) (125,000 copies of novel distributed); *see also Thomas Nelson, Inc. v. Cherish Books, Ltd.*, 595 F.Supp. 989, 991 (S.D.N.Y.1984) (60,000 copies of romance novel distributed).

AMI initially resisted IBM's proposal that AMI identify for IBM by serial number the machines for which falsely labelled microcode was supplied as redundant of information already provided in discovery. AMI Memorandum Concerning Relief at 16; AMI Reply Memorandum Concerning Relief at 46. AMI concedes elsewhere that it "would gladly reproduce [the list of serial numbers]" if IBM could not locate it. AMI Reply Memorandum Concerning Relief at 45, n. 24. The implication of AMI's offer is that the information would not be difficult for AMI to assemble and AMI therefore should produce this list to IBM.

Again, AMI initially resisted but later concedes the necessity of its notifying the end users of the existence of the false labels and of this Court's decision. AMI Reply Memorandum Concerning Relief at 47. AMI's proposal would combine notice to the end-users with provision of substitute labels which correctly state the origin of the tape; the end users would then arrange for the new labels to replace the false ones.[7] While AMI's proposal, put forth for the first time in its Reply Memorandum, moves AMI closer to IBM's position, AMI does not agree with IBM that a recall of the falsely labelled microcode is necessary.

The ultimate goal of IBM's proposed retroactive relief would be for AMI to recall from end-users any falsely labelled microcode still in their possession. IBM Memorandum Concerning Relief at 42; IBM Reply Memorandum Concerning Relief at 51. AMI argues there is no need to recall the falsely labelled tapes because:

> the overwhelming majority of that microcode has now been replaced by IBM under the EC [engineering changes] procedure, and ... IBM, not the machine owner or user, has possession of that microcode. IBM has, in effect, requested the Court to order a 'recall' from itself of the small quantity of AMI labeled microcode which might remain in the field.

AMI Memorandum Concerning Relief at 18.[8]

---

**7.** AMI proposes to send to each end-user a registered letter with the following message:

> At one time Allen–Myland, Inc. ("AMI") reconfigured microcode for your IBM 3090 computer and created new backup tapes with typewritten labels identifying the tape as "PROPERTY OF IBM—UNAUTHORIZED USE PROHIBITED." Those labels were different from authentic IBM labels in that they did not bear the blue IBM logo and they were typewritten rather than printed.
>
> In fact, those copies of the tape were not prepared by IBM, but by AMI. The United States District Court for the Eastern District of Pennsylvania has found that the labels AMI placed on the backup tapes violated the Lanham (Trademark) Act and we are therefore enclosing a set of substitute labels which correctly state the origin of the tapes. We ask you to check your tapes to see if they bear the infringing labels and, if they do, to take steps to have the new labels placed either over, or in place of, the existing labels. To this end, you may wish to provide the substitute labels

to the IBM Customer Engineer who has access to the backup tapes.

> The text of the five replacement labels enclosed would be:
>
> This tape was prepared by Allen–Myland, Inc., of Broomall, Pennsylvania. Recorded on it is microcode originally created by International Business Machines Corp. ("IBM") which IBM identifies as:
>
> Part No. _____
> Engineering Change Level _____
> All copyright in the microcode is the exclusive property of IBM and no copies thereof may be made without the express permission of IBM.

AMI Reply Memorandum at 47–48.

**8.** Thus, while AMI opposes a recall it also concedes that at least some falsely labelled microcode remains in the field. Its argument that no retrospective relief is necessary because IBM has possession of some of the falsely labelled tapes is therefore not persuasive. AMI Memorandum Concerning Relief at 18.

I am not persuaded that a recall is necessary to remedy AMI's past violations. IBM relies on two decisions to support its request for a recall but neither of them requires nor even recommends that a court order a recall of infringing articles.[9] Instead, in each case the court permitted a recall as "within the broad powers of [a federal district court] as a court of equity." *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. 1209, 1226 (D.Del.1986); *see also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 646 F.2d 800, 807 (2d Cir.1981) ("Of course, a district court should carefully consider the likely burden and expense of a recall before it imposes the remedy. In some circumstances the imposition of a recall may be unduly onerous, as where the defendant's products are widely distributed ... Or the probable benefit to the plaintiff from a recall may not outweigh the burden to the defendant in some cases even if that burden is relatively light.").[10]

AMI resists a recall as imposing a "substantial hardship on AMI without any corresponding benefit to IBM," AMI Reply Memorandum at 48, and proposes instead that it supply the end-users with corrected labels which the end-users would have replace the false labels. AMI Reply Memorandum at 47. I find the relief suggested by each party can be combined to produce an equitable result. Thus, once IBM has in its possession the list of end-users and the list of serial numbers:

> IBM will determine if it has already replaced AMI's microcode. If it has, AMI will have to do no more than inform the relevant end users of the Court's decision

and the fact that the falsely labelled microcode has already been replaced by IBM. If IBM has not, then AMI's obligation to identify these end users will have served an obvious salutary result.

IBM Reply Memorandum Concerning Relief at 54–55.

If IBM has not yet replaced the falsely labelled microcode in a particular machine, that end-user will make use of the substitute labels AMI will provide pursuant to its proposal for relief. *See supra* note 6. I will enter judgment imposing injunctive relief consistent with this discussion at the same time as I issue an order granting relief with respect to the other counterclaims.

### D. *IBM's First Counterclaim*
#### 1. Tuscon Electric

■ The parties agree that AMI should pay IBM damages of $415,000.00 for breaching its Agreement for Purchase of IBM Machines by ordering from IBM a net-priced 3083B to 3083J upgrade but instead using it to perform a 3083E to 3083J upgrade at the Tuscon Electric Company. *AMI v. IBM* II, 746 F.Supp. at 554–55; IBM Memorandum Concerning Relief at 15–16; AMI Memorandum Concerning Relief at 26. The parties also agree that New York law governs the contract[11] and that under New York law IBM is entitled to recover prejudgment interest at the statutory rate of 9 percent. 7B N.Y.C.P.L.R. § 5001(a) and 5004 (McKinney 1963 and 1991 Supp.); IBM Memorandum Concerning Relief at 16; AMI Memorandum Concerning Relief at

---

**9.** The other decisions cited by IBM do not concern the recall remedy. *See Mercury Foam Corp. v. L & N Sales & Marketing*, 625 F.Supp. 87, 92 (E.D.Pa.1985) (notice and prospective injunction); *Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822 (3d Cir.1981) (injunction requiring labeling imposed by district court); and *Williams v. Curtiss–Wright Corp.*, 691 F.2d 168, 171 (3d Cir.1982) (preliminary injunction against use of numbering system).

**10.** AMI relies on *Burndy Corp. v. Teledyne Industries, Inc.*, 584 F.Supp. 656, 670 (D.Conn.), *aff'd.* 748 F.2d 767 (2d Cir.1984), to support its argument that because IBM has failed to demonstrate any hazard which might result from

the continued use of any AMI created tapes that remain in the field IBM is not entitled to a recall. AMI Memorandum Concerning Relief at 18–19 n. *. While the *Burndy* court did decline to order a recall because the continued presence of the infringing product in the market did not pose a public risk, its decision was guided by general principles of equity and was not required by the Lanham Act. *Burndy*, 584 F.Supp. at 670, *aff'd.*, 748 F.2d at 774.

**11.** Neither party contests the applicability of the choice of law clause in the Agreement, which provides that it shall be "governed by the laws of the State of New York." IBM Memorandum Concerning Relief at 16, n. 19; AMI Memorandum Concerning Relief at 28–29.

26. The parties do not agree on the date from which prejudgment interest is to be computed.

The New York statute provides that prejudgment interest is to be "computed from the earliest ascertainable date the cause of action existed." N.Y.C.P.L.R. 5001(b). Cases construing the statute confirm its meaning to be that the prevailing plaintiff in a breach of contract action is entitled to prejudgment interest from the date the breach was completed. *Van Gemert v. Boeing Co.*, 553 F.2d 812, 815 (2d Cir.1977); *Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 87 (2d Cir.1980); *Quintel Corp., N.V. v. Citibank N.A.*, 606 F.Supp. 898, 915 (S.D.N.Y.1985).

AMI contends that its failure to pay the debt it acknowledges was due IBM was a consequence of IBM's failure to invoice AMI for the debt. AMI argues that prejudgment interest therefore should be disallowed until the date IBM did invoice AMI, December 8, 1989. AMI Memorandum Concerning Relief at 26, 28. AMI offers this as its only defense on this point. It does not challenge IBM's claim that the Agreement was breached on June 9, 1985 nor does it supply any other possible date for the breach. AMI Memorandum Concerning Relief at 26.

None of the decisions AMI cites in support of its position predicates an award of prejudgment interest on a creditor's dispatch of an invoice or any other particular affirmative act by the creditor.[12] Although New York courts have held that "the right to interest may be lost on equitable principles of estoppel, such as a refusal by a creditor to accept a tender," *Quintel*, 606 F.Supp. at 914 (quoting *Knab Bros. Inc. v. Town of Lewistown*, 58 A.D.2d 1016, 397 N.Y.S.2d 45, 46 (4th Dept.1977)), AMI does not contend that IBM refused to accept AMI's tender of payment. In *Knab*, a decision relied on by the *Quintel* decision cited by AMI, *see* AMI Memorandum Concerning Relief at 29, the Court held that

"to be valid as a defense against the accrual of interest running against the debtor, a tender must be shown to be absolute and free from all conditions." *Knab*, 397 N.Y.S.2d at 46.

AMI attempts to characterize two of its actions as "the functional equivalent of a tender": a written request to IBM that it bill AMI, dated July 18, 1985, and Larry Allen's statement in a deposition taken July 10, 1986, that "To date IBM has not billed us. When they do, we will pay that invoice." AMI Memorandum Concerning Relief at 29, 27. I am not persuaded by AMI's analogy. AMI cites no authority to support its characterization of these acts as tendering payment, nor does it rebut IBM's point that tender could have been accomplished simply: "All Mr. Allen had to do was pay." IBM Reply Memorandum Concerning Relief at 23. I therefore reject AMI's argument that interest should run from December 8, 1989, the date IBM sent AMI an invoice for the $415,000.00 AMI acknowledged it owed IBM, *id.* at 26, and accept IBM's argument that interest should run from June 9, 1985, the date the breach of contract was complete. IBM Memorandum Concerning Relief at 16.

The parties should stipulate to the amount in damages to be paid to IBM, based on the 9% statutory interest percentage to be calculated from June 9, 1985.

### 2. Northwest Industries

■ In my decision regarding liability with respect to IBM's counterclaims, I held that AMI breached an agreement for the purchase of a 3083J to 3081K model upgrade for installation on machine serial number 21027 when it instead used this upgrade to perform a 3083B to 3083J upgrade at Northwest Industries on machine serial number 21607. *AMI v. IBM* II, 746 F.Supp. at 555. AMI did not return to IBM the parts removed during the installation of the B to J upgrade, but used them for another upgrade. AMI then was left with

---

**12.** In one of the decisions AMI relies on, *Silver v. United States*, 202 F.Supp. 1 (N.D.N.Y.1962), the Court was not construing the applicable New York statute but the federal Internal Revenue Code.

eight TCMs.[13]

In *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974), a decision relied on by both parties, the Court expressed the goal of damage remedies in contract law:

> ... so far as possible, the law attempts to secure to the injured party the benefit of his bargain, subject to the limitations that the injury—whether it be losses suffered or gains prevented—was foreseeable, and that the amount of damages claimed to be measurable with a reasonable degree of certainty and, of course, adequately proven.

*Id.* 357 N.Y.S.2d at 860, 314 N.E.2d at 420. *See also Curacare, Inc. v. Pollack*, 501 So.2d 470, 472 (Ala.App.1986), *cert. quashed Ex parte Pollack*, 501 So.2d 472 (Ala.1986) (award of damages should not put injured party in better position than would have been had there been performance); *Mutual Life Ins. Co. v. Tailored Woman Inc.*, 283 App.Div. 173, 126 N.Y.S.2d 573, 578 (1st Dept.1953), *aff'd* 309 N.Y. 248, 128 N.E.2d 401 (1955) (damages must be calculated on the basis of plaintiff's loss not on defendant's gain); *Hutchins v. Bethel Methodist Home*, 370 F.Supp. 954, 964 (S.D.N.Y.1974) (measure of damages for breach of contract is the amount necessary to put plaintiff in as good a position as he would have been had defendant abided by the contract).

AMI contends that IBM suffered no economic loss as a result of the breach found by the Court[14] because AMI paid IBM for the J to K upgrade and for this type of transaction, "IBM was not contractually entitled to the return of any removed parts." AMI Memorandum Concerning Relief at 21; AMI Reply Memorandum Concerning Relief at 37–38. AMI therefore argues that IBM is not entitled to any damages resulting from AMI's breach. AMI Memorandum Concerning Relief at 21; AMI Reply Memorandum Concerning Relief at 37–38.

I am not persuaded by AMI's argument. I find that IBM was damaged because, as IBM argues, AMI's breach "deprived IBM of the benefits it would have received from the transactions AMI did do (a B to J upgrade and an E to B upgrade), had AMI done those transactions legitimately: namely, the revenues from two upgrade MESs and eight returned TCMs." IBM Reply Memorandum Concerning Relief at 24–25. This loss was foreseeable[15] and AMI is therefore liable in damages for its breach of the agreement. The decisions AMI relies on are inapposite as they concern situations in which the plaintiff was not injured by the breach. *See Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal.App.2d 506, 511, 64 Cal.Rptr. 187, 191 (Ct.App.1967) (breach of contract without damage is not actionable); *Bergkamp v. Martin*, 114 Idaho 650, 759

---

**13.** In part of its initial submission, IBM states that AMI retained seven TCM's resulting from the upgrades. IBM Memorandum Concerning Relief at 24. Otherwise, both IBM and AMI refer to the number of TCM's retained as eight, *see e.g.*, IBM Reply Memorandum Concerning Relief at 25; AMI Memorandum Concerning Relief at 20. Eight is the number AMI President Allen testified to at trial. *AMI v. IBM* II, 746 F.Supp. at 555. I therefore will consider the correct number to be eight.

**14.** AMI argues that it breached only the provision which required that the J to K upgrade be installed on a designated machine in accordance with IBM specifications, AMI Memo at 21, and not the two other provisions that I found it had breached in my earlier decision. *AMI v. IBM*, 746 F.Supp. at 554–55. To the extent that

AMI attempts to relitigate its liability for breach of contract, I will not entertain its arguments.

Nor will I again address AMI's argument that the Consent Decree relieves AMI of its contractual obligations. *See* AMI Memorandum Concerning Relief at 25; AMI Reply Memorandum Concerning Relief at 40–41. I have already considered and rejected this defense. *AMI v. IBM*, 746 F.Supp. at 555.

**15.** The foreseeability of damages is to be measured objectively. *See* 5 *Corbin on Contracts* § 1009 ("damages are awarded for a breach ... to compensate the injured party for having damage that ought to have been foreseen whether it was or not.") I do not find reasonable AMI's argument that damages were not foreseeable because AMI President Allen thought IBM would approve of its actions. IBM Reply at 28 n. 21; AMI Memo at 21 n. *.

P.2d 941, 944 (App.1988) (if termination of lease would have had no adverse economic consequence, tenant is not entitled to damages for breach); *Freund,* 357 N.Y.S.2d at 861 (nominal damages awarded to vindicate plaintiff's right to compensatory damages where plaintiff has not proved value of compensatory damages).[16]

## III. APPOINTMENT OF SPECIAL MASTER

In my decision regarding liability, I stated that if the parties could not agree I would refer to a special master determination of the amount of damages on IBM's First, Third and Fourth Counterclaims. *AMI v. IBM* II, 746 F.Supp. at 560. I also said that, as injunctive relief for IBM's Third Counterclaim, I intended "to enjoin AMI from further copying except copying exclusively to perform splits and to require AMI to destroy all 3090 microcode copies it has made and are in its possession except any copies used exclusively to perform splits." *Id.* If the parties could not agree on which specific copies should be destroyed, which they have not, I announced my intention to refer that determination also to a special master. *Id.*

I find that the damages calculation for both the First (Northwest) and Third Counterclaims should be referred to a special master.[17] I also find that the issues related to which copies AMI should destroy should be referred to the master.

### A. *Damages*

Under Fed.R.Civ.P. 53(b), reference to a special master must be "the exception and not the rule." The language of the Rule, however, specifically provides for reference to special master in non-jury trials for "matters of account and of difficult computation of damages" such as are present here. *See* Manual for Complex Litigation 2d at ¶ 21.52; *Studiengesellschaft Kohle m.b.H. v. Dart Industries, Inc.,* 1989 WL 71757, 1989 U.S.Dist. LEXIS 7243 (D.Del. June 21, 1989) (special master appointed to consider issues regarding damages, prejudgment interest, willfulness of patent infringement); *Williams v. Lane,* 1989 WL 111841, 1989 U.S.Dist. LEXIS 11157 (N.D.Ill. Sept. 19, 1989) (no need to show exceptional circumstances when complex accounting situation).

### 1. Third Counterclaim

■ IBM does not object to referring the damages questions relevant to the Third Counterclaim to a special master. IBM does not believe the issues related to damages for its First Counterclaim (Northwest) necessarily need be referred but has proposed a reference order should I decide to refer the issue, which I will follow in part. *See* IBM Memorandum Concerning Relief, Exhibit C.

AMI's argument that no reference to a special master is required for calculation of damages for the Third Counterclaim is premised on its contention that IBM's damages for infringement of its 3090 microcode should be capped at $420 per tape, AMI Memorandum Concerning Relief at 5, 29, a contention which I do not accept. AMI's argument that no reference is needed to determine damages owed for IBM's First Counterclaim (Northwest) also is premised on a conclusion I have not reached, that IBM suffered no economic loss as a consequence of AMI's breach of contract. AMI's Memorandum Concerning Relief at 21, 30. Moreover, AMI did not articulate any objections to my referring the damages issues to a special master should I decline to accept its submissions on the damages questions related to the First and Third Counterclaims.

---

**16.** One case cited by AMI stands for the proposition that the measure of damages for breach of contract is the amount necessary to put the plaintiff in as good a position as it would have been in had the defendant abided by the contract, the appropriate measure here. *See Hutchins v. Bethel Methodist Home,* 370 F.Supp. 954, 964 (S.D.N.Y.1974).

**17.** The parties have agreed substantially on the amount of damages owed for the Fourth Counterclaim, contingent on my finding that damages are owed. As I have found damages are owed, I need not refer this calculation to the special master.

### a. Infringer's Gross Revenue

In arriving at the damages to be awarded for IBM's Third Counterclaim, the special master will follow the plain language of the Copyright Act, which provides for a copyright owner's recovery of an infringer's profits attributable to the infringement, the remedy IBM has elected. *Whelan Assoc. Inc. v. Jaslow Dental Laboratory, Inc.*, 609 F.Supp. 1307, 1322 (E.D.Pa.1985), *aff'd.*, 797 F.2d 1222 (3d Cir. 1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987) ("[Defendants] are liable in damages for the profits made from the sale of the [infringing work]"); *Carl Falkenstein, Inc. v. Lustrelon, Inc.*, C.A. 87–7025, 1989 WL 69692, at p. 11 (E.D.Pa. June 19, 1989), *aff'd. without opinion*, 904 F.2d 693 (3d Cir.1990); *see also* IBM Memorandum Concerning Relief at 3; IBM Reply Memorandum Concerning Relief at 5; AMI Memorandum Concerning Relief at 1–2.

In the comment that accompanies the statute, the burdens of proof to be borne by the respective parties in the damages phase of an action are stated succinctly:

> The language of the subsection [504(b)] makes clear that only those profits 'attributable to the infringement' are recoverable; where some of the defendant's profits result from the infringement and other profits are caused by different factors, it will be necessary for the court to make an apportionment. However, the burden of proof is on the defendant in these cases; in establishing profits the plaintiff need prove only 'the infringer's gross revenue,' and the defendant must prove not only 'his or her deductible expenses' but also 'the element of profit attributable to factors other than the copyrighted work.'

17 U.S.C.A. § 504(b), Notes of the Committee on the Judiciary on Actual Damages and Profits.

For the special master to calculate AMI's profits attributable to its infringement of IBM's copyright, IBM must first bear the burden of proving AMI's gross revenues from its infringement of 3090 microcode

for reconfiguration purposes. 17 U.S.C. 504(b); *Whelan*, 609 F.Supp. at 1322; *Falkenstein*, 1989 WESTLAW 69692 at p. 11; IBM Memorandum Concerning Relief at 4 and n. 3.

### b. Infringer's Deductible Expenses

▮ AMI then will have the burden of proving any expenses attributable to the infringing activity which should be deducted from the gross revenues established by IBM. *Sheldon v. Metro–Goldwyn Pictures*, 106 F.2d 45, 54 (2d Cir.1939), *aff'd.*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *Falkenstein*, 1989 WL 69692 at p. 11; *Nimmer on Copyright* § 14.03[B], at 14–29 (1990); *see also Business Trends Analysts Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 406 (2d Cir.1989) (language of 504(b) means profits in the lay sense of gross revenue less out-of-pocket expenses).

The remedies provisions of the copyright act do not specify what kinds of expenses will be regarded as deductible costs. However, AMI will not satisfy its burden by producing only general financial statements with broad categories of expenses: "In general it may be said that only those expenses which are proven with some specificity to relate to the infringing work may be deducted in determining the profits attributable to such work." *Nimmer on Copyright* § 14.03 at 14–28; *see also Kamar*, 752 F.2d at 1332; *Sheldon*, 106 F.2d at 54, *aff'd.*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940) ("Overhead which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be"). Which direct and indirect expenses should be deducted is a factual determination to be made by the special master consistently with this opinion. *See Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 409, 60 S.Ct. 681, 688, 84 L.Ed. 825 (1940) ("deductions allowed in the computation of the net profits ... involve questions of fact").

In *Sheldon*, the Supreme Court affirmed the Court of Appeals' decision to permit the infringer to deduct overhead which assisted in the production of the infringement despite a judicial finding that the infringe-

ment was "deliberate plagiarism." 106 F.2d 45, 54 (2d Cir.1939), aff'd., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940). However, other decisions construing the 1909 Act and at least two under the 1976 Act have held that an infringer may not deduct that portion of its overhead expenses that are specifically linked to the infringing activity where the infringement was willful.[18] *See e.g., Manufacturers Technologies, Inc. v. Cams, Inc.,* 728 F.Supp. 75, 84 (D.Conn.1989) (1976 Act) (defendant's "overhead or 'allocated expenses'" not deductible because the infringement was willful); *Harper House, Inc. v. Thomas Nelson, Inc.,* 1987 WL 30581, 1987 U.S.Dist. LEXIS 14132 (C.D.Cal.1987) (1976 Act) (not plain error to instruct jury to ignore overhead deductions upon a finding of willfulness); *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 515 (9th Cir.1985); *Kamar,* 752 F.2d at 1331 (allowing overhead deductions because the infringement was not deliberate or willful in the sense of "moral blame," although it may have been willful for computation of statutory damages); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 106 (2d Cir.1951) (income tax payable on gross revenues not deductible where infringement was conscious and deliberate); *Sammons v. Colonial Press, Inc.,* 126 F.2d 341, 348 (1st Cir.1942) ("Possibly a deduction for overhead should be allowed in such a case when the infringement is innocent and denied when the in-

fringement is conscious and deliberate."); *see also* 3 *M. Nimmer* § 14.03[B] at 14–29—14–30.

IBM argues that AMI's infringement was willful and therefore AMI is not entitled to deduct any fixed overhead expenses. IBM Memo at 10–12; IBM Reply at 15–19. AMI contests IBM's characterization of its actions as willful. AMI Memo at 3–4 n. *; AMI Reply at 26–36. AMI does not dispute that a consequence of a finding that the infringement was willful may be that overhead would not be deductible but argues that I need not reach the issue because AMI's infringement was not willful.[19] *See* IBM Memo at 10; AMI Memorandum at 3–4 n. *; AMI Reply Memorandum at 27.

Courts have explained willful infringement in *Manufacturers Technologies, Inc. v. Cams,* 706 F.Supp. 984, 1002 (D.Conn. 1989) ("infringement was perpetrated with the defendants' actual knowledge of their infringing conduct and therefore was willful"); *Harper House,* 1987 WL 30581, 1987 U.S.Dist. LEXIS 14132 (willfulness under the Copyright Act means intentional, deliberate infringement); *Kamar,* 752 F.2d at 1331 (infringements were not willful "in the senses of intent or moral blame" because not deliberate); *Sammons,* 126 F.2d at 351 (infringement not willful where not "conscious and deliberate"); *Sheldon,* 309 U.S. at 397, 60 S.Ct. at 682 (infringement was willful because movie producers deliberately lifted portions of a copyrighted play); *Alfred Bell,* 191 F.2d at 106 and n.

---

**18.** At least one commentator is critical of following this approach under the 1976 Act: "the 1976 Act, unlike the 1909 Act, always entitles the plaintiff to elect statutory damages, with the possibility of increased awards against willful infringers. If willfulness is to be penalized, statutory damages represents the appropriate route." P. Goldstein, *Copyright: Principles, Law and Practice* § 12.1.2.1(d) at 326 (footnote omitted) (1989).

**19.** I will not adopt the rule of a panel of the Court of Appeals for the Seventh Circuit that a copyright infringer may not reduce its exposure by deducting any fixed overhead expenses. *See* IBM Memorandum at 9 (citing *Taylor v. Meirick,* 712 F.2d 1112, 1121 (7th Cir.1983); *see also Manufacturers Technologies,* 728 F.Supp. at 82–3 and n. 7 (noting conflict between *Taylor* and the views of the Second and Ninth Circuits).

IBM urges also that I analogize to a trademark decision, *Century Distilling Co. v. Continental Distilling Corp.,* 205 F.2d 140, 146–47 (3d Cir.), *cert. denied,* 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400 (1953), in which the Court of Appeals for the Third Circuit approved the district court's disallowance as a deduction of fixed overhead and allowance of expenses which "[varied] with increased production but not in direct proportion thereto." *Id.* at 147; *see* IBM Memorandum at 7–8. While I do not agree that *Century Distilling* requires disallowance of fixed overhead deductions in every case, as the infringement in that case was found by the district court to have been willful, I agree with IBM that *Century Distilling* suggests the view the Court of Appeals for the Third Circuit would adopt in the copyright area. 205 F.2d at 145. I need not reach this issue, however, as I conclude that AMI's infringement was not willful.

32 ("open and unabashed piracy" where one defendant was "apparent[ly] uncon-cern[ed] over the validity of the plaintiff's copyright" and defendants reproduced li-thographs with a false copyright label, sold them after notice and claimed an "unclean hands" defense only after they filed their original answers to the complaint).[20]

Both parties cite decisions in which courts have considered the meaning of will-fulness in the context of awarding statu-tory damages under 17 U.S.C. 504(c)(2), as opposed to the remedy IBM has elected, recovery of the profits of the infringer under 17 U.S.C. 504(b). Unlike the 504(b) remedy IBM has elected, the statutory damages provision specifically addresses the consequences of willful infringement and the respective burdens of proof to be borne by the parties. It does not, however, define the term "willful." 17 U.S.C. 504(c)(2).

Neither party cites authority to support the view that the concept of willfulness should be the same in the separate contexts of determining statutory damages and de-termining whether overhead should be de-ducted from defendant's infringement prof-its. *See Kamar*, 752 F.2d at 1331 (willful-ness has different meanings under statu-tory damages and deductibility of over-head); *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1113 (2d Cir.1986), *on remand*, 670 F.Supp. 1133 (E.D.N.Y.1987), *aff'd.*, 862 F.2d 304 (2d Cir.1988) ("Inno-cence is only significant to a trial court

when it fixes statutory damages, which is a remedy equitable in nature."); *but see Manufacturers Technologies*, 706 F.Supp. at 1002 (in liability portion of trial, Court relied on *Fitzgerald* to hold defendant's conduct willful). Under 504(c)(2), findings of both willfulness and innocence are ex-ceptional; since a defendant's actions may fit neither description, the concepts are not simply the converse of one another. *See e.g.*, *Nimmer*, § 14.04[B] at 14-40.4—14-40.4(1). Nevertheless, decisions explaining willfulness under 504(c)(2) are useful to approach the meaning of "willfulness" un-der 504(b).

Courts in the Third Circuit have defined a defendant's willfulness under 504(c)(2) as acting with knowledge that its actions con-stituted copyright infringement. *See e.g.*, *Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.*, 658 F.Supp. 458, 464 (E.D.Pa.1987) (willfulness requires "the plaintiff to show that the infringer acted with actual knowledge or reckless dis-regard for whether its conduct infringed upon the plaintiff's copyrights"); *Broad-cast Music, Inc. v. Golden Horse Inn Corp.*, 709 F.Supp. 580, 581 (E.D.Pa.1989) (not willful where plaintiff did not try more than once to induce defendants to obtain a license and defendants did not persist in violating the Copyright Act); *Bly v. Ban-bury Books, Inc.*, 638 F.Supp. 983, 986–87 (E.D.Pa.1986) (not willful where defendant did not act with knowledge that its unau-thorized use of computer program would constitute copyright infringement).[21]

---

**20.** In the criminal context, the Court of Appeals for the Second Circuit held there was sufficient evidence to support a conviction for willful in-fringement for profit when the defendant delib-erately had copies of a statute made. *United States v. Backer*, 134 F.2d 533, 535 (2d Cir.1943).

**21.** IBM also cites several decisions from other Circuits which further explain willfulness under 504(c)(2). *See Peer Int'l. Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335–36 (9th Cir.1990) (de-fendants knew that continuing to use plaintiffs' copyrighted works after revocation of license was infringement and therefore willful); *Broad-cast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir.1988) (defendant who knew of reg-istration requirements and consciously decided to violate them acted willfully despite inability to pay required fees); *Fitzgerald*, 807 F.2d at 1115 ("a defendant's knowledge that its actions

constitute an infringement establishes that the defendant acted willfully within the meaning of § 504(c)(2) for purposes of enhancing statutory damages"); *Old Brompton Road v. Southern Comfort Foods, Inc.*, 703 F.Supp. 879, 882 (W.D.Wash.1988) (infringement was willful within meaning 504(c)(2) where defendants were aware and had reason to believe that their public performance of copyrighted songs with-out permission would constitute infringements); *Nick-O-Val Music Co. v. P.O.S. Radio, Inc.*, 656 F.Supp. 826, 829 (M.D.Fla.1987) (in broadcast-ing copyrighted music without permission, de-fendants deliberately ignored their license fee delinquencies, that their licenses had been re-voked, that they faced liability under copyright laws and ASCAP's attempted renegotiation); *Hearst Corp. v. Stark*, 639 F.Supp. 970, 980 (N.D.Cal.1986) (not willful; defendants neither

AMI argues that its actions are similar to those of the infringer in *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505 (9th Cir.1985), because AMI claims it believed its actions were legal at the time of the infringements.[22] AMI Reply Memorandum at 22, 29. In *Frank*, the Court held that a hotel did not willfully infringe an ASCAP copyright when it relied on an ASCAP license to perform music in connection with a stage revue. 772 F.2d at 515. Although the license did not authorize the hotel's actions, the Court held that the mistaken belief that it did was not unreasonable and therefore that the infringement was not willful:

> Defendants believed their use of *Kismet* was protected under MGM Grand's ASCAP license. Although their contention ultimately proved to be wrong, it was not implausible. Defendants reasonably could have believed that their production was not infringing plaintiffs' copyrights, and, therefore, the district court was not clearly erroneous in finding that their conduct was not willful.

*Id.*

In *Alfred Bell*, the Court noted that a mark of an infringer's good faith in maintaining that its actions were not willful because of a mistaken claim of legal protection was whether the defendant had the mistaken claim in mind when it acted of whether it invoked the claimed defense later. "The 'clean hands' defense was not in the defendants' minds when they infringed; It was not contained in defendants' original answers to the complaint." 191 F.2d at 106 n. 32; *see also, Int'l. Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 382 (7th Cir.1988) (Under 504(c)(2), infringer "may not avoid a finding of willfulness by the assertion of a reasonable [even if unsuccessful] legal defense if such defense was determined only after the act of infringement occurred.") (citing Nimmer § 14.04[B] at 14–40.4 n. 28). It is also useful to understand that, in the context of statutory damages, a defendant

may prove that its infringement was innocent only by showing "that his infringing conduct was made in a good faith belief of the innocence of his conduct, but also that he was reasonable in holding such good faith belief." *Nimmer*, § 14.04[B] at 14–40.2. AMI claims that it believed its copying of the 3090 microcode for reconfiguration purposes was permissible under the Consent Decree in *United States v. IBM*, No. 72–344, 1956 Trade Cas. (CCH) § 68,-245 (S.D.N.Y. Jan. 25, 1956). I agree that AMI had this belief. Although I held that IBM was not estopped by the Consent Decree from asserting its claim of copyright infringement against AMI because IBM has not "caused or brought about" AMI's copying of 3090 microcode in support of reconfigurations, my rejection of AMI's defense does not mean that AMI was unreasonable in holding or acting upon its belief. *See AMI v. IBM* II, 746 F.Supp. at 540–41. AMI's primary Consent Decree defense was that IBM had violated the provisions which prevented IBM from "prohibiting, or in any way subjecting to IBM control or approval" alterations in, attachments to or experimentation with 3090 systems. *Id.* at 542. AMI's argument was that IBM violated the Consent Decree "by seeking to retain title to a machine part it is required to sell and by employing its 3090 microcode copyright as a means to control or prevent its customers' machine alterations." *Id.* at 542–43 (quoting AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 9). Although I held that the provisions of the Consent Decree should not be read in isolation, AMI's position was not unreasonable since, as I stated in my earlier opinion, the relevant provisions "if read in isolation, could be read to divest IBM of all its intellectual rights in the parts of its computers." *AMI v. IBM* II, 746 F.Supp. at 543.

The record supports the reasonableness of AMI's belief in its Consent Decree defense. The terms of the Consent Decree

---

were nor should have been aware that their activities were infringing and did not recklessly disregard plaintiff's rights where defendants reasonably and in good faith believed their conduct was not infringing).

**22.** Of course AMI does not concede that its defense based on the Consent Decree is invalid.

were not easily interpreted. *See AMI v. IBM* II, 746 F.Supp. at 538–47 and n. 28. IBM obtained a copyright in the 3090 microcode, *id.* at 527–28, which I held to be "a necessary element of the 3090 system." *Id.* at 542. Unlike the defendant in *Alfred Bell*, 191 F.2d at 106 n. 32, cited by IBM, AMI did raise defenses in its original Reply to IBM's Counterclaims based generally on estoppel and IBM's obligations under the Consent Decree. *See* Reply to Counterclaim at 9, 12 and 15; *see also* Plaintiff's Post–Trial Memorandum of Law at 111–12 (June 15, 1987); Reply to Amended and Supplemental Counterclaims at 16–18, 20; and AMI Reply Memorandum at 32.

IBM lists several facts of record to support its argument that AMI's infringement was willful, including AMI's copying after IBM filed its initial counterclaim, AMI's ordering of microcode from IBM in 1987 and AMI's request for a copyright license from IBM. IBM Reply Memorandum at 16–17. The record shows that AMI's behavior was intentional but does not support a finding of willful infringement because, I find, AMI reasonably believed that its actions were immunized by the Consent Decree. I, therefore, will refer to the Special Master the question of the extent to which deductions, including overhead and other expenses, should be permitted.

### c. *Profit Attributable to Factors Other than the Copyrighted Work*

In addition to proving deductible expenses, AMI bears the burden of proving "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. 504(b). Apportionment of the infringer's profits is appropriate when:

> it is clear that all the profits are not due to the use of the copyrighted material, and the evidence is sufficient to provide a fair basis of division, so as to give to the copyright proprietor all the profits that can be deemed to have resulted from the use of what belonged to him.

Sheldon, 309 U.S. at 402, 60 S.Ct. at 685. The Supreme Court has held that to carry its burden the infringer need not demonstrate the portion of its profits attributable to non-infringing elements with "mathematical exactness" but must provide "a reasonable approximation." *Id.* at 408, 60 S.Ct. at 688. Any doubt should be resolved in favor of the plaintiff. *Id.; see also Gaste v. Kaiserman*, 863 F.2d 1061, 1070 (2d Cir.1988) ("Confronted with imprecision in the computation of expenses, a court should err on the side of guaranteeing the plaintiff a full recovery, but want of precision is not a ground for denying apportionment altogether."). Again, whether a fair basis of division exists to apportion profits is a factual question for the Special Master to consider. *Frank Music*, 772 F.2d at 518 ("Arriving at a proper method of apportionment and determining a specific amount to award is largely a factual exercise"); *Blackman v. Hustler Magazine Inc.*, 800 F.2d 1160, 1165 (D.C.Cir.1986) (apportionment of profits is a fact-bound inquiry).[23]

To summarize, I will direct the Special Master to conduct a factual inquiry on damages to be awarded with respect to IBM's Third Counterclaim in which the parties will bear the burdens described above. In arriving at a damages figure in his report and recommendation, the Special Master will address the issues of which expenses AMI may deduct, consistent with this opinion, from the gross revenues established by IBM and whether a fair basis of division exists to apportion profits.

### 2. First Counterclaim

Regarding IBM's First Counterclaim (Northwest), I also find that the calculation of damages will require a factual inquiry better performed by the special master. After receiving evidence from the parties concerning IBM's damages in connection with the Northwest Industries claim, the special master will recommend to the Court a method of calculating damages[24] and an

---

**23.** AMI contends it realized no profits from the use of the copied microcode. AMI's Memorandum Concerning Relief at 6–7, note *; AMI's Reply Memorandum Concerning Relief at 13–14.

**24.** IBM has proposed two alternative measures of damages. *See* IBM Memo at 19–20, 21–23; IBM Reply Memo at 25–26.

amount of damages to which IBM is entitled to place it in the same position it would have been in had AMI not breached its contractual obligations. The special master will then calculate prejudgment interest on the recommended damage amount using the method agreed upon by the parties, the New York statutory rate of nine (9) percent and beginning on the date of the breach, October 29, 1984.[25]

### B. *Injunctive Relief*

■ Rule 53 provides that for purposes other than an accounting in a non-jury case, a reference to a special master "shall be made only upon a showing that some exceptional condition requires it." *See* Manual for Complex Litigation 2d § 21.52. The "extraordinary expenditure of time, effort and detail work" necessary to determine the members of the prevailing subclasses, correction of salary rankings and determination of liability and damages owed for individual claims was held to be an "exceptional condition" justifying reference to a special master in *Chang v. University of Rhode Island,* 606 F.Supp. 1161, 1278 (D.R.I.1985). Similarly, a special master is appropriately appointed here to determine which tapes should be destroyed.

The question of which tapes AMI should be required to destroy is not wholly separate from the question of what prospective injunctive relief I should order regarding the Third Counterclaim. For example, AMI proposes that it be allowed to copy or retain copies of 3090 microcode "reasonably necessary" to "perform splits of 3090 computers," AMI Proposed Order at ¶ 18(a); that it be allowed to copy or retain copies of 3090 microcode "reasonably necessary" to "perform reconfigurations of 3090 computers if IBM has not delivered to AMI within three business days from IBM's receipt of AMI's order therefor a properly configured 3090 microcode tape", AMI Proposed Order at ¶ 18(b); and that it be allowed to copy or retain copies of 3090 microcode "reasonably necessary" to "per-

form experimentation with 3090 computers in accordance with the provisions of Section VII(d)(2) of the Consent Decree." AMI Proposed Order at ¶ 18(c).

IBM vigorously objects to AMI's proposal on several grounds, among them that such an injunction would be impermissibly vague: "exactly which existing copies in AMI's current data base and library are 'reasonably necessary' to retain, and therefore not be destroyed, for future splits, reconfigurations and/or 'experimentation' purposes is undetermined ... We submit the ambiguities built into AMI's proposed injunction are not inadvertent; they would permit the very copying for which IBM sued—and on which it prevailed—to continue unchecked." IBM Memorandum Concerning Relief at 35, 36. As I find the issue of which tapes should be destroyed is not isolated from the remaining issues regarding appropriate injunctive relief for IBM's Third Counterclaim, about which the parties also disagree, I will defer decision on prospective injunctive relief pending receipt of the special master's recommendation as to which tapes should be destroyed.

IBM agrees that the issue of destruction is properly referred to the special master. IBM Memorandum Concerning Relief at 36 n. 33. AMI disagrees and argues I should determine that the injunctive relief proposed by IBM would "assist IBM in violating the Consent Decree and would restrict AMI more broadly than necessary to avoid injury to IBM." AMI Memorandum Concerning Relief at 30. I conclude that it is more appropriate for me to decide this issue after receipt of the special master's recommendation as to which tapes should be destroyed.

The special master's function will be limited to making recommendations by which I will not be bound. "The mandate of Rule 53(e)(2) that in a non-jury action the court 'shall accept the master's findings of fact unless clearly erroneous' does not ... apply where the master is directed only ... to make recommendations or where the order

---

**25.** AMI does not contest IBM's assertion that it is entitled to prejudgment interest at this rate and from this date.

of reference states 'that the findings of the master should not be final or be given presumptive effect, and that all matters referred should be open for determination by the court as if no findings had been made.'" 5A *Moore's Federal Practice* ¶ 53.12[2] at 53–109—53–110; *see also* 5A *Moore's Federal Practice* ¶ 53.12[4] at 53–115 ("clearly erroneous" provision of Rule 53(e)(2) does not apply to the master's recommendations or to his conclusions of law); *In re Mifflin Chem. Corp.*, 123 F.2d 311, 313 (3d Cir 1941), *cert. denied sub nom Sheridan v. Rothensies*, 315 U.S. 815, 62 S.Ct. 804, 86 L.Ed. 1213 (1942). The Court therefore will retain ultimate responsibility for relief.

## IV. REFERENCE ORDER

1. *Appointment.* Pursuant to Rule 53, John P. Lavelle, Jr., Esquire,[26] is appointed as special master for the purpose of considering damages owed to IBM for its First Counterclaim (Northwest) and Third Counterclaim, for the purpose of considering what tapes should be destroyed (IBM's Third Counterclaim) and for such other matters as may be referred to him hereafter by the Court.

2. *Procedures.* The Special Master will have the rights, powers, and duties provided in Rule 53 and may adopt such procedures as are not inconsistent with that Rule or with this or other Orders of the Court.

All proceedings before the Special Master will be transcribed. Those transcripts along with any written submissions or correspondence by the parties to the Special Master or by him to the parties will be made a part of the record of this case.

3. *Reports.* After considering the evidence and arguments presented by the parties, the Special Master will make findings of fact and conclusions of law with respect to matters presented by the parties and report to the Court pursuant to Rule 53(e) as applicable in non-jury actions. The find-

ings of the master will not be final nor will they be given presumptive effect.

4. *Fees and Expenses.* The parties and the Special Master should attempt to agree upon the Master's compensation. Absent agreement, his compensation will be fixed by the Court. The parties will pay the Special Master his fees and reimbursement for reasonable expenses promptly after he renders a statement. Initially, the Master's fees and expenses will be shared equally by IBM and AMI; upon entry of judgment by this Court, I will file a final Order with respect to such fees and expenses.

---

**26.** The Court proposed to the parties that Mr. Lavelle serve as master should one be required. IBM agreed with the Court's choice and, while it

contested the necessity of appointing a master, AMI did not object to the Court's proposed candidate.